**Joy WINKLE, Appellant,**

v.

**Hugh S. TULLOS, M.D., Appellee.**

**No. 14–93–00995–CV.**

Court of Appeals of Texas,
Houston (14 Dist.).

Nov. 16, 1995.

Rehearing Overruled Feb. 8, 1996.

Dissenting Opinion on Overruling of Rehearing Feb. 8, 1996.

Rehearing Overruled March 7, 1996.

John Holoway, Houston, for appellant.

David R. Norton, Dallas, Kevin J. Keith, Dallas, for appellee.

Before LEE, AMIDEI and EDELMAN, JJ.

## OPINION

EDELMAN, Justice.

In this medical malpractice case, Joy Winkle appeals from two judgments rendered in favor Hugh S. Tullos, M.D. on the grounds that (1) the claims relating to her first surgery were not barred by limitations, (2) the jury charge on limitations was erroneous, (3) the trial on limitations was improperly bifurcated, (4) the statutory provisions governing disclosure of medical risks and informed consent are unconstitutional, (5) the portions of the jury charge on informed consent and negligence were invalid, (6) the jury's responses on lack of informed consent, negligence and damages were not supported by the evidence, and (7) evidence was improperly excluded. We affirm.

On November 6, 1984, Dr. Tullos performed knee replacement surgery on Winkle. On July 16, 1985, Dr. Tullos performed revision surgery on her to cement a loose part of the artificial device to the bone. In both procedures, a tourniquet was used on Winkle's leg. However, while in recovery from

the second surgery, Winkle showed signs of poor circulation in her foot. Dr. George Noon, a vascular surgeon, was called in for consultation. After an arteriogram showed a blockage above the knee, Dr. Noon performed bypass surgery in an attempt to alleviate Winkle's circulation problems. The following day, Dr. Noon performed another surgical procedure to remove the blockage. These surgeries were unsuccessful, and Dr. Tullos amputated Winkle's right leg below the knee on July 25, 1985.

On July 13, 1987, Winkle filed suit against Dr. Tullos complaining of the revision surgery performed on July 16, 1985. On August 14, 1990, Winkle filed a second amended petition in which she added a claim for negligence relating to the original knee replacement surgery Dr. Tullos performed on November 6, 1984.[1]

In 1991, the trial court conducted a separate trial on whether Winkle's claims concerning the first surgery in 1984 were barred by limitations. Based on a jury verdict, the court entered an interlocutory judgment that those claims were barred. In 1993, a second trial was held on the issues of liability and damages arising from the second surgery in 1985. Based on a jury verdict, the trial court entered a take-nothing judgment in favor of Dr. Tullos. This is an appeal from both judgments.

## I. LIMITATIONS TRIAL

In points of error three through eight, Winkle challenges the sufficiency of the evidence to support the jury's failure to find that (1) she did not have a reasonable opportunity to discover her cause of action for the first surgery and file suit within the applicable time period, and (2) Dr. Tullos fraudulently concealed the cause of action from her. She also contends in point nine that, as a matter of law, limitations was "tolled" by the "continuous treatment" exception set forth in the Medical Liability and Insurance Improvement Act (the "Act"). *See* TEX.REV.CIV. STAT.ANN. art. 4590i, § 10.01 (Vernon Supp. 1995).

Because her contentions of delayed discovery of her claim and fraudulent concealment were in the nature of affirmative defenses to Dr. Tullos' limitations defense, Winkle bore the burden of proof on those issues. To prevail in challenging the legal sufficiency of the adverse findings on these issue on which she had the burden of proof, Winkle must demonstrate that the evidence conclusively established all vital facts in support of the issue. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). When reviewing such a "matter of law" point, (1) we examine the record for evidence that supports the finding, ignoring all evidence to the contrary, and (2) if there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* If the contrary proposition is established conclusively, we sustain the point. *Meyerland Community Improvement Ass'n v. Temple*, 700 S.W.2d 263, 267 (Tex.App.— Houston [1st Dist.] 1985, writ ref'd n.r.e.).

In attacking the factual sufficiency of evidence concerning issues on which she had the burden of proof, Winkle must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In deciding this challenge, we must examine the entire record to determine if there is some evidence to support the finding, if the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, or if the great preponderance of the evidence supports its nonexistence. *Id.* When a party complains of the jury's failure to find a fact, we may reverse only when the great weight of the evidence supports an affirmative answer. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988); *see also Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 647 (Tex.1988) (holding that court of appeals has authority to review jury's "failure to find" in same manner as it reviews jury findings).

### A. Application of Section 10.01

Section 10.01 of the Act provides, in relevant part:

---

1. Dr. Noon was not sued in this lawsuit.

Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed within two years [1] from the occurrence of the breach or tort or [2] from the date the medical or health care treatment that is the subject of the claim or [3] the hospitalization for which the claim is made is completed. . . .

TEX.REV.CIV.STAT.ANN. art. 4590i, § 10.01 (Vernon Supp.1995).

■■■■ Importantly, however, in each case, the limitations period does not run from *any* of these three dates, *i.e.*, whichever is later, but from only the one which is applicable to the particular circumstances. Where the date on which the breach or tort occurred is ascertainable from the facts of the case, the limitations period runs from that date. *Kimball v. Brothers*, 741 S.W.2d 370, 372 (Tex. 1987).[2] Where that date is not ascertainable, and the injury occurs during a course of treatment for a particular condition, the limitations period runs from the date that treatment was completed. *Id.*[3]

### 1. Continuous Course of Treatment

In her ninth point of error,[4] Winkle argues that the limitations period for her first surgery was governed by the continuous course of treatment rule since there was a period of continuous treatment between that surgery on November 6, 1984 and the second surgery on July 16, 1985, and she timely filed suit within two years of the second surgery.[5]

■■■■ The continuous treatment rule often arises in suits alleging misdiagnosis or mistreatment. *Kimball*, 741 S.W.2d at 372; *see*

also *Chambers v. Conaway*, 883 S.W.2d 156 (Tex.1993); *Rowntree v. Hunsucker*, 833 S.W.2d 103, 105–06 (Tex.1992). However, it is inappropriate where the negligent act was the surgery itself. *See, e.g., Gormley v. Stover*, 907 S.W.2d 448, 449–50 (Tex.1995) (holding that a suit filed more than two years after surgical procedure was barred where any negligence occurred during surgery and not afterwards).[6] Nor does follow-up treatment after a surgical procedure extend the limitations period when the complaint concerns the surgical procedure. *Marchal v. Webb*, 859 S.W.2d 408, 417 (Tex.App.—Houston [1st Dist.] 1993, writ denied); *Thames v. Dennison*, 821 S.W.2d 380, 383 (Tex.App.—Austin 1991, writ denied).

■■■■ In this case, Winkle's only complaint about the first surgery was that it was unnecessary and inappropriate due to her age and weight. Because this surgery was allegedly unnecessary, Winkle claimed that the follow-up care for it was also rendered unnecessary, but did not otherwise complain about the follow-up care that was given. Since Winkle's complaint as to the first surgery related to the surgery itself, and the surgery occurred on a readily ascertainable date, the continuous course of treatment rule is inapplicable, and the limitations period for that claim began on the date of the surgery, November 6, 1984. We therefore overrule point of error nine.

### 2. Open Courts

In points of error three through six, Winkle claims the evidence established that she did not have a reasonable opportunity to

2. *See also Bala v. Maxwell*, 909 S.W.2d 889 (1995).

3. Similarly, although not applicable here, where a claim is based on the hospitalization itself, the limitations period runs from the date the relevant hospitalization was completed. *Kimball*, 741 S.W.2d at 372.

4. For ease of understanding, the points of error will be addressed by subject rather than in numerical order.

5. In order to sustain this point of error, we would also have to conclude that the allegations in the amended petition concerning the first sur-

gery "relate back" to the original petition, *i.e.*, that the amendment was not "wholly based on a new, distinct, or different transaction or occurrence." *See* TEX.CIV.PRAC. & REM.CODE ANN. § 16.068 (Vernon 1986); *Bradley v. Etessam*, 703 S.W.2d 237, 240 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).

6. *See also Desiga v. Scheffey*, 874 S.W.2d 244, 248 (Tex.App.—Houston [14th Dist.] 1994, no writ) (holding that date of surgery is applicable date for commencing statute of limitations as a matter of law); *Martin v. Cohen*, 804 S.W.2d 201 (Tex.App.—Houston [14th Dist.] 1991, no writ) (finding course of treatment analysis inapplicable where alleged negligence occurred in and immediately after surgery).

discover her cause of action for the first surgery within the statutory limitations period, and that she filed suit within a reasonable time of her discovery. Winkle asserts that when she filed her suit originally, she did not know the first surgery was unnecessary or that there was any reason to sue Dr. Tullos for the first surgery. She complains that Dr. Tullos never told her that her amputation was his fault because he was negligent or the first surgery was unnecessary. She contends it was not until after Dr. George Sibley's report was mailed to her attorney in January of 1990 that she knew of a possible malpractice claim against Dr. Tullos for the first surgery. Dr. Sibley stated in that report, and in his testimony at the first trial, that Winkle did not need the total knee replacement surgery.

■ The discovery rule has been abolished in cases governed by the Act. *Morrison v. Chan*, 699 S.W.2d 205, 208 (Tex.1985). However, where it is impossible for an injured plaintiff to discover her injury within two years, application of Section 10.01 violates the Open Courts Provisions of the Texas Constitution. *See* TEX. CONST. art. I, § 13;[7] *Morrison*, 699 S.W.2d at 207; *Neagle v. Nelson*, 685 S.W.2d 11, 12 (Tex.1985); *see also Hellman v. Mateo*, 772 S.W.2d 64, 66 (Tex.1989) (per curiam); *Nelson v. Krusen*, 678 S.W.2d 918, 921 (Tex.1984).

■ In this case, Winkle discovered her injury, the amputation of her leg, in July of 1985, within two years of the first surgery in November 1984. She still had over fifteen months, until November 1986, to investigate further and file suit. Yet, despite that she was herself a nurse and that her medical records from the first surgery were available, she did not choose to obtain an expert opinion until 1990, over four years after her amputation, and after her suit related to the second surgery had been on file nearly two and a half years.

Her expert testified that the knee replacement should not have been performed on someone of her age, weight, and with her history of circulation problems. However, these considerations were already known to Winkle. She testified that before she visited Dr. Tullos, two other surgeons had told her that knee replacement surgery should be reserved for those over 60 years old, they would not perform it on her, and she needed to lose weight before considering such surgery. Moreover, Winkle admitted that she had no expert report before filing her original suit on the second surgery. Therefore, we see no reason Winkle could not have brought a claim related to the first surgery within two years. To adopt Winkle's argument that the two-year statute should not run until the date she received Dr. Sibley's report would not only reinstate the discovery rule clearly abrogated in section 10.01 of the Act,[8] but would also allow a plaintiff to control the running of limitations by electing when to pursue investigation of a possible claim. We decline to do so.

Accordingly, we hold that application of Section 10.01 does not violate the Open Courts Provision in this case, and overrule points of error three through six.

### 3. Fraudulent Concealment

In points seven and eight, Winkle attacks the sufficiency of the evidence supporting the jury's failure to find fraudulent concealment in Question Three at the first trial.

■ The doctrine of fraudulent concealment provides that where a defendant is under a duty to make disclosure, but fraudulently conceals the existence of a cause of action from the party to whom it belongs, the defendant is estopped from relying on the defense of limitations until the party learns of the right of action, or should have learned of it through the exercise of reasonable diligence. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 352 n. 1 (Tex.1990) (citing *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983)). A physician has a duty to disclose a negligent act or the fact that an injury has

---

7. The Open Courts Provision provides: "[a]ll courts shall be open, and every person for an injury done to him, in his lands, goods, person or reputation, shall have remedy by due course of law."

8. *See Morrison*, 699 S.W.2d at 208.

occurred, and Section 10.01 does not abolish fraudulent concealment as an equitable estoppel to the defense of limitations under that statute. *Borderlon,* 661 S.W.2d at 908, 909.

■ In this case, Dr. Tullos adamantly denied any negligence in his treatment of Winkle and testified that he never believed that he was negligent, so he would not have told Winkle that he was. Dr. Tullos testified that whenever Winkle asked him a question about her treatment, he did his best to answer it as well and as truthfully as he could. He stated he never had a fixed purpose to conceal any wrong or other information from Winkle. The only contrary evidence was that Dr. Tullos never told Winkle that he was negligent. We hold that this evidence is both legally and factually sufficient to support the jury's failure to find fraudulent concealment. We overrule points of error seven and eight.

### B. Charge Error

■ In points ten, eleven and twelve, Winkle complains about the court's charge on limitations. A trial court's submission of a theory of recovery or defense by questions or instructions should be reviewed under an abuse of discretion test, recognizing that there is a presumption in favor of broad-form submission of questions. TEX.R.CIV.P. 277; *Texas Dept. of Human Serv. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990); *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 256 (Tex.1974). Failure to submit a question on which the requesting party has the burden of proof is reversible error only if the question was requested in writing in substantially correct form. TEX.R.CIV.P. 278. The party complaining of the judgment must also request an omitted definition or instruction in substantially correct form. *Id.* It is not reversible error to fail to submit "other and various phases or different shades of the same question." *Id.*

■ To have a case reversed on jury charge error, harmful error must be shown. *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 749–50 (Tex.1980). To determine if failure to submit a requested instruction is reversible, we must consider the pleadings, the evidence, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986). Error is reversible only if, when viewed in light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP.P. 81(b)(1).

■ In point ten, Winkle argues that the court erroneously asked the jury in Question Two about her discovery of her "injury" instead of her "cause of action." She claims this question is incorrect and prejudicial. However, inquiry as to the discovery of the injury rather than the cause of action was correct. *See Morrison,* 699 S.W.2d at 207–08. We overrule point of error ten.

In point eleven, Winkle complains that the court erred in refusing her requested instruction on limitations. The only requests made at the first trial in our record instruct on fraud and misrepresentation. Winkle argues these instructions are "necessary guidelines," but cites no authority that these tendered instructions are substantially correct. Points of error not supported by argument and authorities are waived. TEX.R.APP.P. 74(f); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983). In addition, Winkle fails to show how she was harmed by the failure to instruct the jury in this manner. We overrule point of error eleven.

In point twelve, Winkle complains that "if any" before negligence in Question Three is unnecessary, incorrect and prejudicial. Winkle cites no authority for this proposition, and makes no showing of harm, and has therefore waived any error on this point. *Id.* We overrule point of error twelve.

### C. Bifurcation of Limitations Trial

In point of error twenty-nine, Winkle claims the trial court erred in granting Dr. Tullos' motion to bifurcate the trial on limitations. A court may order a separate trial of any claim or issue "in furtherance of convenience or to avoid prejudice." TEX.R.CIV.P. 174(b). We have found no written or oral objection in the record to the bifurcation of the trial on limitations. This claimed error is

not preserved for our review. Tex.R.App.P. 52(a). We overrule point of error twenty-nine.

## II. SECOND TRIAL

In the second trial, the jury failed to find Dr. Tullos liable for lack of informed consent, misrepresentation, negligence, gross negligence and damages in connection with the revision surgery on Winkle's knee.

### A. Informed Consent

■ A claim for failure of a doctor to fully inform a patient of the risks of surgery is a negligence cause of action, and is governed by the Act. *McKinley v. Stripling*, 763 S.W.2d 407, 409 (Tex.1989). The Act created the Texas Medical Disclosure Panel (the "Panel") to determine which risks and hazards must be disclosed to patients undergoing medical care and surgical procedures. Tex.Rev.Civ.Stat.Ann. art. 4590i, § 6.03(a) (Vernon Supp.1995). The Panel prepares lists of surgical procedures and treatments that do and do not require disclosure of risks, respectively, and establishes the form and degree of disclosure required for each. *Id.* § 6.04(b).

Disclosure of risks in compliance with the Act creates a rebuttable presumption that the physician was not negligent in failing to disclose risks. *Id.* § 6.07(a)(1). Similarly, a failure to disclose in compliance with the statute creates a rebuttable presumption that the doctor was thereby negligent. *Id.* § 6.07(a)(2).

■ As to procedures for which the Panel has made no determination regarding the duty of disclosure, the physician is under the "duty otherwise imposed by law." Tex.Rev. Civ.Stat.Ann. art. 4590i, § 6.07(b) (Vernon Supp.1995). This duty is the same as that imposed in Section 6.02 of the act, that is, "to disclose all risks or hazards which could influence a reasonable person in making a decision to consent to the procedure." *Peterson v. Shields,* 652 S.W.2d 929, 931 (Tex.1983).

■ In cases involving disclosure of risk, it is no longer necessary to provide expert testimony regarding the standard of care in a certain community. *Id.* Instead, Section 6.02 of the Act replaces this common law locality rule with a "reasonable person" rule, *i.e.,* whether the risks were disclosed that would influence a reasonable person in deciding whether to consent to a proposed medical procedure. *Id.* The creation of the Panel also eliminates the need for expert medical testimony regarding the materiality of the risk in most cases. *Id.*

### 1. Constitutional Issues

In point of error one, Winkle raises several arguments attacking the constitutionality of the Act's procedure for determining and disclosing risks, and its rebuttable presumption of non-negligence where the Act is complied with. However, we have recently addressed these same arguments and found the Act to be constitutional. See *Penick v. Christensen,* 912 S.W.2d 276, 287 (Tex.App.—Houston [14th Dist.] 1995, writ requested). Accordingly, we follow our decision in *Penick,* and overrule point of error one.

### 2. Charge Error

In points two and eighteen, Winkle argues that informed consent was incorrectly submitted to the jury in Question One.[9] She

---

9. Question One, with its accompanying instructions, asked:

Did DR. TULLOS fail to disclose to JOY WINKLE the risks and hazards of the surgery performed on July 16, 1985?
The law requires DR. TULLOS to disclose to JOY WINKLE the following risks and hazards of the surgery performed July 16, 1985:
a. Impaired function such as shortening or deformity of an arm or leg, limp or foot drop.
b. Blood vessel or nerve injury.
c. Pain or discomfort.
d. Fat escaping from bone with possible damage to a vital organ.
e. Failure of bone to heal.
f. Bone infection.
g. Removal or replacement of any implanted device or material.
The failure of a physician to disclose those risks and hazards on a written form, signed by the patient or a person authorized to consent for the patient and a competent witness, is presumed to constitute a failure to disclose such risks. This presumption may be overcome if the physician adequately disclosed such risks and hazards in some other manner.

asserts that the trial court erred in overruling her objections to the informed consent question and in refusing her requested instructions on informed consent.

■ In particular, Winkle objected to Question One on the ground that it failed to advise the jury concerning the obligation of a physician to disclose "all risks, hazards, or dangers" inherent in the surgery. This objection was properly overruled because the duty imposed by the Act is not to disclose *all* risks, but only those that could influence a reasonable person in making a decision to consent to the procedure. See TEX.REV.CIV. STAT.ANN. art. 4590i, § 6.02 (Vernon Supp. 1995); *Peterson*, 652 S.W.2d at 931.

■ Winkle also objected that the statute is unconstitutional, a complaint we have already overruled in point of error one. Finally, Winkle complained that the question as submitted was prejudicial because the accompanying instruction advised that the disclosure made was presumed to comply with the law.[10] This objection was properly overruled because the Act specifically provides that a disclosure made in compliance with the Act is admissible in evidence in a suit claiming negligent failure to disclose, that it creates a rebuttable presumption that the requirements of the Act have been satisfied, and that "this presumption shall be included in the charge to the jury." See TEX.REV.CIV. STAT.ANN. art. 4590i, § 6.07(a)(1) (Vernon Supp.1995).[11] We overrule point of error two.

In point of error eighteen, Winkle refers to nineteen different questions and instructions she proposed on informed consent. It was Winkle's burden to submit the informed consent issue in substantially correct form. See TEX.R.CIV.P. 278. Moreover, it was her burden to point out distinctly the objectionable matter and grounds of the objection. See TEX.R.CIV.P. 274.

Where, as here, an objection or request is obscured by voluminous unfounded objections or numerous unnecessary requests, the objection or request is waived. See TEX. R.CIV.P. 274; *Jon–T Farms, Inc. v. Goodpasture, Inc.*, 554 S.W.2d 743, 751 (Tex.Civ. App.—Amarillo 1977, writ ref'd n.r.e.). Accordingly, we find that Winkle's objections and requests on informed consent preserved no error for review, and overrule point of error eighteen.

■ In point of error twenty-four, Winkle contends that Questions Four (1) and (2) on negligent and intentional misrepresentation were prejudicial. The complaining party is required to object when the court submits a question, instruction, or definition that is erroneous. See TEX.R.CIV.P. 274. The party may not rely on a previous request, even if the request was a proper submission. *Johnson v. State Farm Mut. Auto. Ins.*, 762 S.W.2d 267, 270 (Tex.App.—San Antonio 1988, writ denied). Here, there is no timely objection to Question Four reflected in the record.[12] Accordingly, any error is again waived. See TEX.R.APP.P. 52(a). We overrule point twenty-four.

### 3. Sufficiency of the Evidence

In points nineteen and twenty, Winkle challenges the sufficiency of the evidence to

A written consent signed by a patient which specifically states the above risks and hazards is presumed to constitute the disclosure of such risks and is a compliance with the law.

10. The same disclosure form was used for both the replacement and revision surgeries. Winkle does not dispute that this form or the question submitted to the jury contained the disclosure specified by the Act.

11. However, as noted below, Winkle's expert witness, Dr. Sibley testified in this case, among other things, that Winkle's history of phlebitis should have signalled Dr. Tullos to investigate her vascular condition further before performing the revision surgery, and that the use of the tourniquet was a factor in her vascular complications. It is, thus, arguable that this evidence raised an inference that the risk of amputation, even though not listed on the Panel's disclosure form, should have been disclosed based on the particular circumstances in this case. This, in turn, may have justified a further instruction to the jury concerning rebuttal of the statutory presumption. However, no such instruction was requested.

12. Nor was an instruction requested concerning a possible violation of the Texas Deceptive Trade Practices Act for knowing misrepresentation or breach of express warranty of a particular result. *See Sorokolit v. Rhodes*, 889 S.W.2d 239, 243 (Tex.1994).

support the jury's failure to find a lack of informed consent. Winkle contends that she was not informed that amputation was a risk of artificial knee revision surgery, and she would not have consented to the surgery had she been informed of this risk. The standards for reviewing the jury's failure to find matters on which the complaining party bears the burden of proof have already been set forth earlier in this opinion.[13]

■ Evidence supporting the jury's failure to find a lack of informed consent can be found in Winkle's admission that she signed a disclosure and consent form for the knee revision surgery.[14] It is undisputed that arthroplasty, or joint replacement, is one of the procedures for which the Panel has promulgated risks to be disclosed, and that these risks are those listed on Winkle's form. It is also undisputed that the disclosure form meets the statute's other requirements for creating the rebuttable presumption of non-negligence. In addition, Dr. Tullos testified that Winkle was shown a videotape before surgery explaining the procedure and discussing the risks. Winkle acknowledged that she had initialled the disclosure form indicating that she had seen the video, but testified she did not remember the video explaining the risks of surgery.

Moreover, Dr. Noon testified that the risk of amputation from use of a tourniquet during knee surgery is "almost zero." While Winkle's expert testified that her previous problems with thrombophlebitis would increase the risk, Dr. Noon testified that the thrombophlebitis had nothing to do with Winkle's circulatory problems after surgery. He testified that thrombophlebitis affects the veins, and Winkle suffered blockages in her arteries. Dr. Noon testified that only risks that occur with some frequency are disclosed,

and that it is impossible to disclose every possible complication that could occur during surgery. We hold that this evidence was both legally and factually sufficient to support the jury's answers to Question One, and overrule points of error nineteen and twenty.

In points twenty-five and twenty-six, Winkle attacks the sufficiency of the evidence to support the jury's failure to find negligent or intentional misrepresentation of facts as to the necessity of the surgery or the risks involved. As we have already recognized, in a suit against a doctor for failure to disclose or adequately disclose medical risks, the only theory on which recovery may be obtained is negligence in failing to disclose risks or hazards. See TEX.REV.CIV.STAT.ANN. art. 4590i § 6.02 (Vernon Supp.1995); *McKinley*, 763 S.W.2d at 409. Thus, to the extent Question 4 inquired as to negligent misrepresentation of risks, that question was duplicative of Question 1, and the same evidence supported the jury's negative answer to both.

■ We, thus, have left to consider the evidence concerning negligent or intentional misrepresentation of the necessity of surgery, and that of intentional misrepresentation of risks. Winkle contends that the evidence supporting these claims were Dr. Sibley's condemnation of the surgery, the complications suffered by the patient and Dr. Tullos' statement that one option available to Winkle before the revision surgery was to simply do nothing and leave it alone. However, neither these facts nor any others we can find in the record raise an inference that Dr. Tullos misrepresented the necessity of the surgery or the risks involved. Accordingly, we overrule points of error twenty-five and twenty-six.

---

13. See Section I above.

14. In relevant part, the disclosure stated:
I (we) realize that common to surgical, medical and and/or diagnostic procedures is the potential for infection, blood clots in veins and lungs, hemorrhage, allergic reactions, and even death. I (we) also realize that the following risks and hazards may occur in connection with this particular procedure:
Arthroplasty of all joints with mechanical device

1. Impaired function such as shortening or deformity of arm or leg, limp or foot drop.
2. Blood vessel or nerve injury.
3. Pain or discomfort.
4. Fat escaping from bone with possible damage to a vital organ.
5. Failure of bone to heal.
6. Bone infection.
7. Removal or replacement of any implanted device or material.

## B. Negligence

### 1. Charge Error

Winkle also objects to the jury charge on negligence and the court's refusal to submit various questions on different aspects of the negligence issue. In point of error thirteen, she complains of the court's refusal to submit her "series of issues" on whether Dr. Tullos' negligence in failing to obtain a pre-surgery vascular evaluation was a proximate cause of her injuries. In point fourteen, she contends the trial court erred in refusing her questions on negligence in diagnosis or treatment of the "post-vascular complications." In point fifteen, she asserts the trial court erred in refusing her proposed questions and instructions on the necessity of the surgery and Dr. Tullos' alleged negligence in subjecting her to surgery when she was at increased risk for amputation due to her vascular problems. In point sixteen, she complains that issues and instructions on negligence in failing to advise her of the risk of amputation should have been submitted. In point seventeen, she complains that the court erred in refusing her questions on negligence, gross negligence, fraud and lack of informed consent in submitting her to surgery with increased risks of amputation. Finally, in point of error twenty-one, she complains the trial court erred in overruling her objections the Question Five on negligence.

Unless extraordinary circumstances exist, Rule 277 requires broad-form submission rather than separate questions on each ele-ment of a cause of action. Tex.R.Civ.P. 277; *E.B.*, 802 S.W.2d at 649. The issue of Dr. Tullos' negligence in the second surgery was submitted in broad form.[15] However, contrary to the directive on broad-form submission, Winkle complains on appeal that the trial court should have submitted several additional questions inquiring about specific acts of negligence or gross negligence. *See Watson v. Isern*, 782 S.W.2d 546, 554–55 (Tex.App.—Beaumont 1989, writ denied).

 Four of these rejected questions inquired about negligence of Dr. Tullos in submitting Winkle to surgery in the face of risks attendant to the surgery due to her vascular condition.[16] A fifth question asked about Dr. Tullos' "diagnosis, care and treatment" of Winkle in connection with the second surgery and thereafter. Another refused question asked whether Dr. Tullos' conduct in delaying treatment of Winkle's post-surgery vascular complications was gross negligence. The remaining refused question inquired about negligence broadly. All of these issues were encompassed in the broad form questions on negligence and gross negligence.

 In addition, one of Winkle's proposed questions is identical to the Question Five on negligence which was actually submitted in this case. Parties may not invite error by requesting an issue and then objecting to its submission. *General Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993). Accordingly, we overrule points of

---

**15.** Negligence was submitted as follows:

In answering the following question, you are to consider only the diagnosis, care and treatment in connection with the surgery on July 16, 1985 and the diagnosis, care of treatment of JOY WINKLE after July 16, 1985.

QUESTION NO. 5

Did the negligence, if any, of DR. TULLOS proximately cause, if any, any injury or damage suffered by JOY WINKLE?

Answer "Yes" or "No."

**16.** These four refused questions were:

Under the circumstances existing at the time prior to the surgery in question, was there an increased risk of possible amputation of Joy Winkle's leg if she underwent the revision surgery?

Did the negligence, if any, of Dr. Tullos in failing to obtain a pre-surgery vascular evalua-tion or vascular test proximately cause any injury or damage suffered by Joy Winkle as a result of submitting to the surgery on July 16, 1985?

Under the circumstances existing at the time prior to the surgery in question, was Dr. Tullos negligent, if any, in submitting Joy Winkle to surgery to revise the tibial component in view of the risks or dangers inherent in surgery or post-operative complications of the vascular system which could necessitate her leg being amputated, and was such negligence a proximate cause, if any, of the injury or damages suffered by Joy Winkle due to the amputation?

Under the circumstances existing at the time prior to the surgery in question, was there a medical necessity for submitting Joy Winkle to surgery in view of the risk or dangers inherent in the surgery or post-operative complications of the vascular system which could necessitate her leg being amputated?

error thirteen through seventeen and twenty-one.[17]

### 2. Sufficiency of the Evidence

In points twenty-two and twenty three, Winkle attacks the sufficiency of the evidence supporting the jury's failure to find negligence in answer to Question Five.

 Winkle first argues the tourniquet was too tight and was left on too long during surgery, causing the loss of circulation in her lower leg. Dr. Tullos testified he was not negligent and that a tourniquet is usually kept on for no more than three hours during surgery. He said that most doctors leave a tourniquet on for two hours without "letting down" to restore circulation. This surgery lasted one hour and twenty minutes, well within this margin. Dr. Tullos also testified that the pressure used on the tourniquet was standard, at 350 millimeters of mercury. Dr. Noon, the surgeon who attempted to correct Winkle's vascular problems, also testified that it is common to stop the blood supply during surgery for two to two and a half hours. He saw no evidence that use of the tourniquet caused Winkle's problems or that Dr. Tullos cut an artery. Dr. Sibley, Winkle's expert, conceded that he had no criticism of Dr. Tullos' surgical technique or post-operative care in this case. Thus, there was evidence that Dr. Tullos' use of the tourniquet during surgery was within reasonable medical standards.

Winkle also contends that Dr. Tullos was negligent in performing unnecessary revision surgery on her knee. However, Winkle testified that she was in continued pain seven months after her knee replacement and was unable to fully use the knee. Dr. Tullos testified that x-rays from June of 1985 showed a subtle loosening of the device and that no bone was growing into the prosthesis. During the surgery, he confirmed that the prosthesis was loose.

With regard to Winkle's allegations that Dr. Tullos should not have performed revision surgery without a more extensive evaluation of her vascular condition, Dr. Noon testified that Winkle's thrombophlebitis had nothing to do with her problems after the revision surgery. He instead found congenital anomalies in Winkle's blood vessels, which could not have been predicted and were at least partly responsible for the lack of circulation to her foot. Dr. Noon testified that he did not know what caused the blood clots that blocked Winkle's circulation, but saw nothing inappropriate that Dr. Tullos might have done to cause the blockage. Dr. Noon testified Winkle was not a poor candidate for surgery, and that no further studies are normally done before surgery unless a patient shows symptoms of poor circulation. Winkle had normal color and temperature in her leg and foot before surgery. Dr. Tullos agreed that Winkle's artery problems had nothing to do with her thrombophlebitis.

Contrary evidence was provided by Dr. Sibley who testified that Winkle's history of phlebitis was a "red flag" that should have caused Dr. Tullos to investigate Winkle's vascular condition further before surgery. Dr. Sibley also testified that the revision surgery was not necessary, although his initial report did not express that opinion. It was his opinion that use of the tourniquet was a factor in Winkle's vascular complications, and that the delay in performing vascular surgery contributed to the loss of her leg.

In addition, Dr. Tullos admitted that the tourniquet used on Winkle was not calibrated, leaving open the possibility of a faulty reading causing excessive pressure on the leg. However, if the tourniquet had been in place too long, muscle and nerve damage would have resulted, not damage to an artery. Dr. Tullos testified that Winkle had no nerve damage, and there was no evidence of muscle damage. Dr. Noon admitted that the records before surgery indicated that Winkle's posterior tibial and dorsalis pedis pulses in her foot were not palpable at maximum levels, but asserted that this did not necessarily indicate the presence of circulation problems.

17. It is also unclear how Winkle could have been harmed by the broad-form submission since it allowed Dr. Tullos to be found negligent if any ten or more jurors believed he committed *any* act of negligence. By contrast, Winkle's proposed submission on individual acts of negligence would have required ten or more jurors to agree on the *same* act of negligence.

■ Winkle testified that Dr. Tullos told her that amputation was required "because the tourniquet was on too tight and for too long." Dr. Tullos denied making this statement and the jury apparently believed him. Because this court is not a fact finder, we may not review the credibility of the witnesses or substitute our judgment for the trier of fact. *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 387 (Tex.1989).

We conclude that the jury's failure to find that Dr. Tullos was negligent is supported by both legally and factually sufficient evidence. We overrule points of error twenty-two and twenty-three.

### C. Damages

■ Winkle attacks the jury's finding of zero damages in points of error twenty-seven and twenty-eight. However, the answers to the damage questions were rendered immaterial by the findings of no liability. See *Ramsey v. Lucky Stores, Inc.,* 853 S.W.2d 623, 635 (Tex.App.—Houston [1st Dist.] 1993, writ denied). A zero damages award presents no reversible error when the jury finds on sufficient evidence the defendant was not negligent. *Id.* Accordingly, we overrule points of error twenty-seven and twenty-eight.

### D. Exclusion of Evidence from the First Surgery

■ In point of error thirty, Winkle complains that the trial court erred in excluding evidence in the second trial relating to Dr. Tullos' alleged fraud and negligence in connection with the first surgery. For the exclusion of evidence to constitute reversible error, the complaining party must show (1) that the trial court committed error, and (2) that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex.1992); TEX.R.APP.P. 81(b)(1). In making this determination, we must review the entire record. *McCraw,* 828 S.W.2d at 757.

■ The excluded evidence is found in Dr. Sibley's testimony by bill of exception that the facts in Winkle's medical records did not justify a total knee replacement. Winkle claims this evidence would have established the "tendency" of Dr. Tullos to perform unnecessary surgery. However, this evidence was inadmissible because it was offered to demonstrate that Dr. Tullos acted in conformity with prior actions. See TEX.R.CIV. EVID. 404(b); *see also Watson,* 782 S.W.2d at 549–50 (sustaining exclusion of evidence of previous alleged negligence by physician). We hold that the trial court properly excluded this evidence and overrule point of error thirty.

Based on the foregoing, we affirm both judgments of the trial court.

AMIDEI, Justice, dissenting on motion for rehearing.

I respectfully dissent. I agree with the majority that appellee had the duty to disclose only those risks that could influence a reasonable person in making a decision to consent to the procedure in question. *Peterson v. Shields,* 652 S.W.2d 929, 931 (Tex. 1983). This case, however, was not submitted in such a way as to permit the jury to determine whether those risks were disclosed.

I would instead conclude that the procedure performed in this case was not one for which risks have been promulgated by the Disclosure Panel. The second surgery in this case was not an arthroplasty, or joint replacement, but instead a procedure to repair or cement an artificial knee. The type of procedure filled in the blank on the preprinted form signed in this case was "redo right knee." The disclosure form listed the risks found on the Panel's Disclosure List A, under the heading "Musculoskeletal system treatments and procedures," and under the sub-heading for "Arthroplasty of all joints with mechanical device." 6 Tex.Reg. 4668, 4672 (1981). As arthroplasty was not performed during the second surgery, this procedure might be classified instead under List B, which also includes procedures to the "Musculoskeletal system." 6 Tex.Reg. 4668, 4677 (1981).

Nowhere does the disclosure form mention that a tourniquet would be used during the procedure, or that the risk of amputation accompanies the use of a tourniquet. Yet a

tourniquet was used, and appellant's leg was amputated. It is undisputed that appellee never advised appellant of the risk of amputation. Because this was revision surgery, appellant's risk for amputation had increased. Appellant's expert testified that because of her pre-existing vascular problems in her leg, appellant was at an increased risk for amputation if she was required to have revision surgery. Appellant testified that if she had been aware of the risks associated with use of a tourniquet, including possible amputation, she would not have submitted to either the original surgery or the revision surgery. This risk is clearly one that "could influence a reasonable person in making a decision to consent to the procedure." *Peterson,* 652 S.W.2d at 931. Because the Disclosure Panel has not established required disclosures for the use of a tourniquet, *Peterson* controls the issue of informed consent. *See id.* Appellant supplied the expert testimony entitling her to a jury question on whether disclosure of the risk of amputation was necessary under these facts.

As submitted, the charge in this case did not permit the jury to find that the risk of amputation should have been disclosed. Question One asked whether appellee failed to disclose the risks of appellant's second surgery. The jury was instructed that a signed disclosure form, with the risks as listed on the form, was presumed to be in compliance with the law. Thus, the instructions accompanying Question One required the jury to answer "No" if there was a signed disclosure form. The court failed to instruct the jury that the presumption of full disclosure could be rebutted by a showing that other risks, not included on the form, should have been disclosed. Appellant objected to the charge, specifically pointing out that the presumption instruction was prejudicial. Appellant's counsel argued that the court was "instructing the jury as a matter of law rather than submitting a matter of fact to the

jury." Question One, with its instructions, constituted a highly prejudicial comment on the weight of the evidence. Appellant submitted two alternative questions, either of which should have been submitted by the trial court.[1]

In addition, appellant objected to the conditioning of Questions Two and Three on an affirmative answer to Question One. Because the jury had no choice but to answer "No" to Question One, it never had the opportunity to answer Question Two, compounding the error in the charge. Question Two asked whether a reasonable person would have refused surgery "if those risks had been disclosed," referring only to the list of risks for "Arthroplasty" in Question One. Once again the jury was not permitted to consider whether the risk of amputation could have influenced a reasonable person's decision to undergo surgery.

The errors in the charge are fundamental to appellant's entire theory that she did not receive a proper disclosure of the risks involved in undergoing yet another surgery on her knee, particularly in light of her previous vascular problems. It is clear that these errors amount to such a denial of appellant's rights as to cause the rendition of an improper judgment. TEX.R.APP.P. 81(b)(1).

I would grant rehearing of this cause, sustain appellant's points fifteen through eighteen complaining of charge error, and reverse and remand for a new trial.

---

1. Refused Question No. 3: Do you find that a reasonable patient, under the same or similar circumstances as involved in the case of Joy Winkle, would have refused to undergo the surgery in question if advised that there existed a risk of amputation of the patient's leg?

Refused Question No. 6: Do you find that a reasonable person would have refused the surgery in question if the patient had been fully advised as to all risks, dangers, hazards or complications in connection with the surgery, together with the alternatives to such surgical treatment.